## MILTON J. HERMAN, ADMR.
### (Estate of Eva Jenks)
#### vs.
## JOSEPH JAMES JENKS ET AL.

Superior Court        Fairfield County        File No. 70178

MEMORANDUM FILED NOVEMBER 14, 1945.

Shannon & Wilder, of Bridgeport, for the Plaintiffs.

Greenstein & Simons, of Bridgeport, for the Defendants.

QUINLAN, J.   This foreclosure action is met by the defense of payment. The real controversial issue is whether or not payment had been made. On the date alleged in the complaint the mother (now deceased) of the defendant loaned him and his wife $6,000 on a second mortgage. They claim that the mortgage was paid and that on a Christmas Day not long before her death she surrendered to them the mortgage deed and note. This mortgage deed and note was produced in evidence by counsel for the defendants, at the request of plaintiff's counsel, made in open court. The mortgage and note have endorsements thereon, one of them signed "Mama" and two others "Eva Jenks." There is no dispute that the one

signed "Mama" is in the handwriting of the mother. The daughter would not say one way or the other as to whether the words "Eva Jenks" were the mother's handwriting, while the youngest son disputed the handwriting. On the evidence of the defendants they explained how payments were made in different amounts over the years, leaving $140 or $160 at the time the mortgage deed was presented to them with the endorsements. No receipts were offered and the defendant claims not to have had a checking account. There was some suggestion that at times entries were made in a black book. The black book produced in evidence was the diary, but I do not make too much of this because there could have been other black books and this one was mutilated. I prefer to go to the bank accounts, the method of living and the probabilities of sources of income to support the defendants' contention, which I find proven.

The first mortgage had been reduced from $6,000 to $2,000. This is not disputed. The defendant, Joseph Jenks, had an earning capacity of $65 a week throughout the years, his wife averaged at least $40 a week and her tips usually amounted to $15 a week. The combined earnings at a minimum were $5,460. The house upon which the mortgage was placed had rentals which yielded net about $850, making a gross income of sixty-three hundred odd dollars. The structure of the house and the occupation of it by the defendants meant that there was no outlay for rent. The family was Lithuanian. There was born to Joseph and Eva Jenks thirteen children, with presumably some confinement expense with each child, and nine of them died, which certainly entailed a funeral expense on each occasion, with probably illnesses preceding. The father was a polisher by trade, and at one time ran a saloon. The family had acquired two houses which were without mortgage and in 1930 this $6,000 was advanced to Joseph. It does not appear that the mother had any other cash at that time, but the acquisition of the real estate, together with the ordinary family expenses incident to such a sizeable family for people in their station of life would make $6,000 a sizeable amount, in view of the real estate holdings. On the 31st day of March, 1937, the deceased mother had $1,053.70 in the Bridgeport-Peoples Savings Bank and on July 1, 1938, there was brought forward from another book a deposit of $3,102.66 in the Mechanics & Farmers Savings Bank, making

an aggregate of bank accounts of $4,200, more or less. There were deposits between March 31, 1937, and November 30, 1944, of $1,187.99 in the Bridgeport-Peoples Savings Bank and $1,810 deposits in the Mechanics & Farmers Savings Bank. Of the deposits in the Bridgeport-Peoples Savings Bank during this period there was one for $303.16, another for $265, another for $200 and one for $100, whereas twelve of the deposits for the period indicated in the Mechanics & Farmers Savings Bank were $100 each, another of $250 and another of $140. These are large amounts for a woman who had rentals of $38 a month out of which taxes, water and insurance had to be paid. There was no evidence that any one paid any board to her during this time and she must have had some personal expenses and perhaps tried to obtain a little pleasure from helping others. At least she had two withdrawals of $500, three of $300, one of $200 and one of $100 from the Bridgeport-Peoples Savings Bank and $950 in one withdrawal from the Mechanics & Farmers Savings Bank. The sources of the large deposits do not appear and if after loaning $6,000 in 1930 there was a total of over $4,200 some seven years afterwards, with deposits of $2,997 from the later date to the time of her death, there seems no explanation of how these amounts came into existence other than through the payments on the mortgage claimed to have been made by Joseph and his wife. With their earning capacity and their thrifty antecedents it is not strange that they were able to do as they claim. Moreover, there is no suggestion of fraud, undue influence and directly no claim of forgery. The experience of the court is that the secretiveness with which this matter was handled by the mother is not unusual, especially in people of foreign extraction where help is being extended to one child as against others.

Opportunity was given after the conclusion of the trial to offer a writing which was discovered. This writing signed by both parties, changed the rate of interest to four per cent on November 25, 1934. As this was a modification of the original contract it was probably thought important to have the change made in writing. Moreover, it speaks of the balance of payments. It occurred at a time of depression, when such things occurred. It is consistent with the conduct of a person who was taking care of his obligations and wanted to continue to do so. The irresponsible person who cared nothing about

his obligations would simply ignore the whole transaction and permit the debt to accumulate.

In view of the foregoing, judgment may be entered for the defendants to recover their costs.